## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-cv-81503-MIDDLEBROOKS

2 3 SUITED, LLC,

      Plaintiff,

v.

JIGARKUMAR PATEL a/k/a Jigar Patel;
DIPAK PATEL; LARRY PATEL;
PRADIP SANJAY PATEL a/k/a Jay Patel;
UDAY RAVAL; LARRY PATEL 2018
IRREVOCABLE TRUST; MARVELE, LLC;
SIX GROOVE LLC; AND WELDON
DEVELOPMENT LLC,

      Defendant.

_____/

## **OMNIBUS ORDER ON MOTIONS TO DISMISS**

THIS CAUSE comes before the Court on two Motions to Dismiss. Defendants Larry Patel 2018 Irrevocable Trust and Larry Patel (together, "the Patel Defendants," individually "the Patel Trust," and "Larry Patel") jointly moved to dismiss this Complaint (DE 44), and all other Defendants jointly filed a separate Motion to Dismiss. (DE 45). Both Motions were filed on January 18, 2024. After seeking leave from the Court, Plaintiff filed an omnibus Response to both Motions on February 1, 2024. (DE 52). Two Replies followed suit: the Patel Defendants filed their Reply on February 8, 2024 (DE 57), and all other Defendants jointly filed their Reply that same day. (DE 58).

Plaintiff's Complaint states five Counts against the Defendants: Count I is for violations of the Securities and Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5. Count II is for a

violation of Florida Securities and Investor Protection Act, Fla. Stat. § 517.301. Count III is a claim for common law fraudulent inducement, and Count IV is a claim for negligent misrepresentation. Finally, Count V asserts a claim for civil conspiracy. For the following reasons, I will grant the two Motions and dismiss the Complaint in its entirety.

I.     **FACTUAL BACKGROUND**

Because this cause comes before the Court on two Motions to Dismiss, I accept all facts in the Plaintiff's well-pleaded Complaint as true and construe them in the light most favorable to the Plaintiff. *See Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1262 (11th Cir. 2004).

**A.  2 3 Suited purchases millions of Devi Stock.**

In 2020, Leonard Tannenbaum met Jigar Patel, the founder and CEO of a company named Devi Holdings, Inc ("Devi"). (*Id.* ¶ 18). Devi is "a licensed cultivator and retailed of both medical and adult-use cannabis whose operations include cultivation, extraction and processing, and retail products and dispensaries." (*Id.* ¶ 11). That year, Mr. Tannenbaum also formed AFC Gamma, Inc. ("AFC Gamma"), a publicly traded institutional lender that originates, structures, and underwrites loans secured by commercial real estate. (*Id.* ¶ 17). AFC Gamma specializes in loans to state-licensed cannabis operators. (*Id.*).

Mr. Tannenbaum, a macro investor who has underwritten almost $10 billion in loans as well as taken four entities public, began negotiating a Credit Agreement with Jigar Patel on behalf of their respective companies. (*Id.* ¶ 19). The Agreement, which the two men finalized on May 15, 2020, provided that AFC Gamma would issue a series of loans to Devi. As part of the Agreement, Devi would, among other things, provide quarterly compliance certificates to AFC Gamma confirming it had paid all applicable taxes when due. (*Id.*). The first of such loans issued on May 8, 2020, for $42.5 million. (*Id.*).

In late 2020, Jigar Patel approached Mr. Tannenbaum to gauge his interest in purchasing Devi common stock from early investors in the company who were looking to sell their shares. (*Id.* ¶ 20). Specifically, Jigar Patel advised Mr. Tannenbaum that a man named Larry Patel was selling 15 million shares of Devi stock held by the Patel Trust. Another individual by the name of Pradip Patel was selling 6 million shares of Devi stock held by Weldon Development, LLC. (*Id.* ¶ 22). Jigar Patel represented that he was the agent authorized to speak and act on behalf of the sellers, and he was closely assisted throughout the process by individuals Dipak Patel and Uday Raval. (*Id.* ¶¶ 21–22). The latter two specifically worked as an intermediary between the Patel Defendants and Jigar Patel.

Mr. Tannenbaum spoke to Jigar Patel four to five times a week, if not daily, about Devi's financial condition. (*Id.* ¶ 23). Throughout the entirety of the process, Jigar Patel reassured Mr. Tannenbaum that his investments were safe. For example, on November 18, 2020, Jigar Patel delivered a PowerPoint that provided a financial summary for Devi. (*Id.* ¶ 24). This PowerPoint included forecast modeling and a balance sheet, accounting for "accrued liabilities" and "deferred income tax." (*Id.*). Further, in December of 2020, Jigar Patel prepared and delivered a compliance certificate pursuant to the Credit Agreement that AFC Gamma and Devi had entered. (*Id.* ¶ 25).

The reassurances did not stop there. When Mr. Tannenbaum asked Jigar Patel on the phone why so many Devi early investors wanted to sell their stock and if there were any financial problems with Devi, Jigar Patel responded that "there were no problems, that Devi's financials were healthy, and that the shares had a value of approximately $1.50 a share." (*Id.* ¶ 26). Subsequent calls between Mr. Tannenbaum and Jigar Patel resulted in similar representations about Devi's financial condition. (*Id.* ¶ 27).

Apparently assuaged of doubt, Mr. Tannenbaum executed the transactions with the Patel Trust and Weldon Development, LLC, on February 11, 2021. (*Id.* ¶ 23). At the time he entered those transactions, Mr. Tannenbaum was unaware that Mr. Patel had failed to disclose approximately $8 million in tax liabilities that were then due and unpaid by Devi. (*Id.* ¶ 24).

Plaintiff alleges that Jigar Patel, as Devi's CEO, and Dipak Patel, as a former board member of Devi with intimate knowledge of its inner workings and financial condition (*id.* ¶ 22), were both aware of these undisclosed tax liabilities and intentionally omitted them from the information provided to Mr. Tannenbaum. (*Id.* ¶ 24). Plaintiff also alleges that the sellers—the Patel Defendants, their agent Uday Raval, Pradip Patel, and the entity Weldon Development—were aware of these unpaid tax liabilities as well, which was their motivation for dumping their shares. (*Id.*). Plaintiff claims that both Larry Patel and Pradip Patel are either family members or close associates of Jigar Patel, and Larry Patel purposefully structured the sales agreements in a way that would shield him from any resulting liability arising out of the transactions. (*Id.* ¶¶ 20,24).

Ignorant to Devi's $8 million in unpaid tax liabilities for 2020, Mr. Tannenbaum executed the purchases. Mr. Tannenbaum purchased the shares of common stock through a company he owned, Plaintiff 2 3 Suited. (*Id.* ¶ 29). The purchase price from Weldon Development totaled $5,400,000.00—$0.90 a share. (*Id.*). Pradip Patel signed the final stock purchase agreement ("SPA") on Weldon's behalf. (*Id.*). In addition to helping facilitate the transaction between Weldon, Pradip Patel, and Mr. Tannenbaum, Jigar Patel entered into a personal agreement with Pradip Patel, guaranteeing the sale of shares for $1.00 a share. (*Id.*).  In the event the shares had not sold, Jigar Patel would have been obligated to purchase the shares for a $1.00 a share, with a closing date of December 31, 2021. On February 12, 2021, Plaintiff 2 3 Suited purchased 15 million shares of Devi common stock for $15,000,000.00—$1.00 a share—from the Patel Trust.

(*Id.* ¶ 31). Larry Patel executed the term sheet on behalf of the Patel Trust, memorializing the sale, and Jigar Patel continued to act as the Patel Defendants' agent, negotiating the terms of sale and transmitting the "deal documents," or SPAs, between Mr. Tannenbaum and the Patel Defendants. (*Id.* ¶ 30).

In the spring of 2021, Jigar Patel again approached Mr. Tannenbaum about purchasing additional shares of Devi common stock that he personally owned through his other companies. (*Id.* ¶ 31). Mr. Tannenbaum continued to try to do his due diligence, texting Jigar Patel on March 23, 2021, asking if anything was wrong in accounting. (*Id.* ¶ 32). Jigar Patel responded, "I don't think so." (*Id.*).

Throughout the time period where Mr. Tannenbaum was negotiating purchasing Devi stock on behalf of 2 3 Suited, the Credit Agreement between AFC Gamma and Devi remained ongoing. On March 31, 2021, Jigar Patel sent another compliance certificate as it was required to do per the terms of the Credit Agreement. Plaintiff claims that in submitting this certificate, Jigar Patel, as Devi's President and CEO, was representing that, among other things, Devi's outstanding taxes had been paid. (*Id.*). Similarly, on May 12, 2021, Jigar Patel prepared and sent to Mr. Tannenbaum an "investor presentation," which valued Devi's shares at $1.50/share. (*Id.* ¶ 34). Despite Mr. Tannenbaum specifically inquiring "why everyone is selling," Jigar Patel reassured Mr. Tannenbaum that Devi's financials were sound. In fact, Jigar Patel sent a Company Operational Review Board presentation to Mr. Tannenbaum, in which he included a valuation of Devi that omitted Devi's approximately $13 million in unpaid taxes for 2020 and 2021. (*Id.* ¶ 36).

2 3 Suited continued to purchase Devi stocks, relying on Jigar Patel's representations of the financial state of the company. (*Id.* ¶ 37). It purchased 2,666,667 shares of Devi Common Stock from Jigar Patel's company, Six Groove, for $2,826,667.02. (*Id.*). It further purchased

2,500,000 shares of Devi common stock from Defendant company Marvele, LLC, for $2,650,000 at $1.06 a share. (*Id.*). Jigar Patel signed both SPAs on behalf of the respective companies, representing that he was their "manager." (*Id.*).

In total, Mr. Tannenbaum, through Plaintiff company 2 3 Suited, purchased 26,166,667 of Devi common stock from Defendants. (*Id.* ¶ 38). Had Mr. Tannenbaum known about the unpaid tax liabilities, he never would have purchased the stocks. (*Id.*).

**B.  Jigar Patel's Misconduct Comes to Light.**

Over the course of 2021, Jigar Patel concealed Devi's unpaid tax liabilities. (*Id.* ¶ 39). He delayed all financial audits, preventing the 2020 financial audit from being completed until November 2021 and indefinitely delaying the 2021 audit. (*Id.*). He also withheld records from Devi's auditor throughout the entire 2022 fiscal year, and he fired Devi's Chief Financial Officer, falsely blaming her for the audit delays. (*Id.* ¶¶ 39–40).

The Complaint contains further examples of financial losses that Devi experienced at the hands of Jigar Patel's mismanagement. At one point, Jigar Patel directed intercompany sales of cannabis products from a Devi cultivation facility to a Devi dispensary, indicating that these were "high-margin, external sales." (*Id.* ¶ 43). Despite such conduct, the product was old and contaminated, left to rot in a storage facility. (*Id.*). Another instance was that the vast majority of the cannabis products grown at Devi's Arizona facilities turned out to be unsellable. (*Id.* ¶ 44). Moreover, a fire occurred at Devi's properties that was never disclosed. (*Id.*). Jigar Patel also used Devi funds to finance other companies, and he issued off-book loans from Devi to companies he had an interest in. (*Id.*) None of these instances were ever reported on the financial books of Devi as losses. (*Id.* ¶ 43). Plaintiff maintains that Dipak Patel, who worked with Jigar Patel as a former Devi board member, "knew about all of this—and all the remaining Defendants knew about some

if not all of—these irregularities obfuscating the true state of Devi's financial condition." (*Id.* ¶ 44). Uday Raval likewise knew about Jigar Patel's fraud and "demanded and received a $50,000.00 fee for his role in facilitating the fraudulent transaction." (*Id.* ¶ 22).

In October 2022, Jigar Patel resigned as Devi's CEO. (*Id.* ¶ 45). When new members of the company began reviewing the company's books and records, the concealed financial status of the company began to come to light. (*Id.*).

Mr. Tannenbaum learned the extent of Jigar Patel's false representations regarding Devi's unpaid tax liabilities on March 2, 2023. (*Id.* ¶ 46). At a May 17, 2023, shareholder meeting, the board estimated that, because of the $13 million in undisclosed liabilities, the recovery for shareholders that acquired Devi stock in 2021 was "ten to fifteen cents on the dollar." (*Id.* ¶ 47). Meaning Plaintiff 2 3 Suited has experienced a total loss of over $20 million. (*Id.*).

## II.   **PROCEDURAL BACKGROUND.**

Plaintiff filed this Complaint on November 17, 2023. (DE 1). On January 18, the Defendants filed two separate Motions to Dismiss. (DE 44; DE 45).[1] The Motions are fully briefed and ripe for my consideration.

Both Motions raise a variety of grounds for dismissal. First, there is no personal jurisdiction over Dipak Patel, Uday Raval, and the Patel Trust. Second, Plaintiff's claims are barred by merger clauses, specific and particularized nonreliance representations, and affirmative waivers of claims

---

[1] After the Defendants filed both Motions, they jointly moved to confirm that discovery in this Matter was stayed pursuant to 15 U.S.C. § 78u-4(3)(B) and Federal Rule of Civil Procedure 26(c). (DE 50). I granted that Motion pursuant to the Private Securities Litigation Reform Act, which imposes a statutory stay of discovery in all securities fraud cases that are brought by private litigants. *See* 15 U.S.C.A. § 78u-4 ("In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party."). Accordingly, discovery in this Matter has been stayed.

within each of the SPAs between Plaintiff and the entity Defendants. Third, all claims fail to state a plausible claim for relief. Fourth, the claims for fraud and negligent misrepresentation are not pleaded with the particularity required of Federal Rule of Procedure 9(b).  Fifth, Larry Patel is not a proper party to the lawsuit. And finally, Plaintiff has no capacity to file this lawsuit.

### III.    DISCUSSION

Although Defendants all raise multiple grounds for dismissal, I find I need only address two of their arguments as they are dispositive of the inquiry: lack of personal jurisdiction and failure to state a claim as a matter of law. Because I conclude that the SPAs between Plaintiff and the Defendants preclude damages relief as a matter of law, I will ultimately dismiss this case for failure to state a claim.

#### A.  Personal Jurisdiction

I address the issue of personal jurisdiction first. *See Madara v. Hall*, 916 F.2d 1510, 1513–14 (11th Cir. 1990) (holding that the district court "should have addressed the personal jurisdiction question first" when presented with both a rule 12(b)(6) motion and a 12(b)(2) motion).

Three Defendants argue that there is no personal jurisdiction over them in this matter: Defendants Dipak Patel, Uday Raval, and the Patel Trust. In Response, Plaintiff points to both the Securities and Exchange Act, which provides for nationwide service of process, and Florida's long-arm statute, Fla. Stat. § 48.193(1)(a)(6), arguing that the latter provides jurisdiction because the Defendants directed their solicitation activities toward a Florida resident. In Reply, Defendants suggest that it is improper to rely on the Securities and Exchange Act to establish jurisdiction because Plaintiff exclusively cited Fla. Stat. § 48.193(1)(a)(6) as the basis for personal jurisdiction in the Complaint. Defendants submit that it would be retroactively amending the Complaint to now cite the Securities and Exchange Act in Response. But either way, Defendants argue, even were I

to evaluate jurisdiction under the Securities and Exchange Act, the statute only provides jurisdiction if there is "a colorable claim" for the violation. According to the Patel Defendants, because Plaintiff's claims are "insubstantial, implausible, or otherwise completely devoid of merit," Plaintiff cannot fall back on the nationwide service of process provision to obtain jurisdiction over all the Defendants. *See* ((DE 57 at 9) (quoting *Rogers v. Nacchio*, 241 Fed.App'x. 602, 605 n.1 (11th Cir. 2007))).

"When a federal statute provides for nationwide service of process," such a provision "becomes the statutory basis for personal jurisdiction" in an action asserting claims under both federal law and state law. *Rep. of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997). Other circuits outside the Eleventh Circuit have labeled this the doctrine of "pendent personal jurisdiction." *See e.g.*, *United States v. Botefuhr*, 309 F.3d 1263, 1272–75 (10th Cir. 2022); *Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004); *ESAB Grp., Inc. v. Centrucut, Inc.*, 126 F.3d 617, 628 (4th Cir. 1997); *IUE AAFL-CIO Pension Fund v. Hermann*, 9 F.3d 1049, 1056 (2d Cir. 1993), *cert. denied* 513 U.S. 822 (1994). Pendent personal jurisdiction allows courts to exercise personal jurisdiction over defendants "with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction." *Action Embroidery Corp*, 368 F.3d at 1180; *see also BCCI Holdings (Luxembourg) S.A.*, 119 F.3d at 948 (holding that the district court erred in finding that there was no personal jurisdiction over defendants in a claim alleging violations of both RICO and state laws when RICO has a nationwide service provision). Accordingly, under such a doctrine, should I find that Plaintiff has served Defendants in accordance with the nationwide service

9

provision under the Securities and Exchange Act, then Plaintiff can also utilize it as the jurisdictional "hook" for all of its additional, state-law claims.

Regarding Plaintiff's burden of proof at this stage of the proceedings, "a plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009) (citing *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1214 (11th Cir. 1999) (per curiam)). "[A] prima facie cause is established if the plaintiff presents enough evidence to withstand a motion for directed verdict." *Madara*, 916 F.2d at 1514. Where a defendant "challenges jurisdiction by submitting affidavit evidence in support of its position, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction." *Mazer*, 556 at 1274 (internal citations and quotation omitted). However, the burden does not shift back to the plaintiff when "the defendant's affidavits contain only conclusory allegations that the defendant is not subject to jurisdiction." *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006). As always, on a motion to dismiss, a court construes "all reasonable inferences in favor of the plaintiff" regarding jurisdictional disputes. *Id.*

I disagree with Defendants' assertion that by pointing to the Securities and Exchange Act as the jurisdictional hook in Response, Plaintiff "attempts to re-write its own Complaint, after the fact." (DE 57 at 9).  A Plaintiff's burden under Federal Rule of Civil Procedure 8(a)(1) is to allege "a short and plain statement of the grounds for the court's jurisdiction." This does not require a plaintiff to allege the precise statutory language that allows for personal jurisdiction but rather requires a plaintiff to allege sufficient *facts* demonstrating that jurisdiction. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 485–86 (1985) ("'[T]he *facts* of each case must [always] be weighed'

10

in determining whether personal jurisdiction would comport with "fair play and substantial justice.") (quoting *Kulko v. Superior Court of California In & For City & Cnty. of San Francisco,* 436 U.S. 84, 92 (1978)) (emphasis added). Plaintiff's Complaint cites that "[t]his Court has personal jurisdiction over all Defendants because this action arises out of their individual and collective actions targeting 2 3 Suited and its sole member who resides in Florida in pursuit of their fraudulent stock sale scheme." (DE 1 ¶ 14). Plaintiff also dedicates over eight pages detailing the exact ways Defendants perpetuated the allegedly fraudulent scheme and identifies § 10(b) of the Exchange Act, 16 U.S.C. § 78j(b), and Rule 10b-5 promulgated by the SEC, 17 C.F.R. § 240.10b-5, as the statutory basis for its securities fraud claim. Thus, there are sufficient factual allegations in the original Complaint to find that Plaintiff is not retroactively amending its Complaint by identifying the nationwide service provision under the Exchange Act in its Response to establish personal jurisdiction.

Next, the Complaint and the Defendants' own declarations demonstrate that all have sufficient connections to the United States as a whole. Under 15 U.S.C. § 78aa, a district court can "enjoin any violation of [the Securities and Exchange Act]," in "any district wherein the defendant is found or is an inhabitant or transacts business," and a plaintiff can serve process "in any other district of which the defendant is an inhabitant or wherever the defendant may be found." 15 U.S.C. § 78aa. In instances where a federal statute provides for nationwide service of process, "the applicable forum for minimum contacts purposes is the United States." *U.S. S.E.C. v. Carrillo*, 115 F.3d 1540, 1544 (11th Cir. 1997). "In applying the nationwide service of process provision under § 78aa, courts have found that '[i]f a defendant is located in the United States, that defendant will almost always have minimum contacts with the United States sufficient to allow a federal court to exercise personal jurisdiction.'" *Kammona v. Onteco Corp.*, 587 Fed. Appx. 575, 580 n.6 (11th

Cir. 2014) (citations omitted). The Complaint details allegations that all Defendants worked with Jigar Patel, who directed the bulk of his solicitation activity toward Mr. Tannenbaum in Florida. (*See generally* DE 1). Moreover, for purposes of the minimum contacts analysis, the Patel Defendants acknowledge that the Trust was formed in Missouri. (DE 44 at 14). Additionally, both Dipak Patel and Uday Raval attach declarations to their Motion to Dismiss, in which they acknowledge that they permanently reside in the United States. (DE 45-1 ¶ 2; DE 45-2 ¶ 2). These allegations and declarations establish that Plaintiff has met its burden of demonstrating that the Defendants maintain sufficient minimum contacts with the United States. *See AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1364 (11th Cir. 2021) ("[T]he plaintiff must eventually—by the close of evidence—establish personal jurisdiction by a preponderance of the evidence.").

Finally, Plaintiff has asserted a colorable claim for securities fraud. The analysis here is short and sweet. To dismiss a claim for lack of personal jurisdiction under the Securities and Exchange Act, the right asserted by Plaintiff must be "so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise devoid of merit as not to involve a federal controversy." *BCCI Holdings (Luxembourg) S.A*, 119 F.3d at 941 (articulating the standard for making a "colorable" claim under RICO to establish personal jurisdiction). Plaintiff's loss of millions of dollars is alleged to be attributable to Defendant's undisclosed tax liabilities. Therefore, on its face, Plaintiff's Complaint contains federal claims that are certainly *colorable* (although ultimately, not plausible, as will be explained below).

Thus, because Plaintiff served all Defendants in this matter with process pursuant to the nationwide service provision of the Securities and Exchange Act, Plaintiff has demonstrated personal jurisdiction over all Defendants.

### B.  Failure to State a Claim as a Matter of Law

I evaluate a 12(b)(6) motion to dismiss under the standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). That is, the complaint "must . . . contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Counts I through IV of Plaintiff's Complaint are fraud-based claims. Under both Florida and federal law, all of Plaintiff's fraud-based claims require a plausible showing that Plaintiff relied on Defendants' misstatements or omissions. *See, e.g., Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (Section 10(b) and Rule 10b–5 require that plaintiff plead and prove "(1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) on which plaintiff relied . . . .") (citation omitted); *Grippo v. Perazzo,* 357 F.3d 1218, 1222 (11th Cir. 2004) ("The elements of a cause of action under § 517.301 are identical to those under the Federal Rule 10b–5, except that the scienter requirement under Florida law is satisfied by showing of mere negligence."); *Hillcrest Pac. Corp. v. Yamamura,* 727 So. 2d 1053, 1057 (Fla. Dist. Ct. App. 1999*)* (holding that in the context of fraudulent inducement, "[w]ithout justifiable reliance, there can be no fraud"); *Butler v. Yusem,* 44 So. 3d 102, 105 (Fla. 2010) ("As to negligent misrepresentation claims, . . . justifiable reliance on the misrepresentation is required as an element of the claim.").

According to Defendants, Plaintiff cannot establish the element of reasonable reliance for any of its fraud claims. That is because the SPAs memorializing each transaction explicitly state that Plaintiff was entering the contract with the full understanding that Defendants were "privy to material non-public information regarding the Company," and that information might not have been provided to Plaintiff. (DE 44-1 § 3.1(b)). Even further, Defendants cite the language of the

SPAs stating that Plaintiff "waives any claim, or potential claim . . . relating to [the Seller's] possession of Non-Public Information." (*Id.*). Under New Delaware and New York law—which Defendants argue govern the effect of such provisions—Plaintiff cannot claim it was fraudulently induced into purchasing Devi stock.

In Response, Plaintiff disputes that such provisions bar Plaintiff's prosecution of this action for three reasons: First, Florida law governs this case, and it would allow recission of the SPAs under a theory of fraudulent inducement, which is the relief Plaintiff seeks. Second, even if New York or Delaware law applied, these are not true anti-reliance provisions precluding recovery. Third, at minimum, because the plain language of the SPAs creates a triable issue of fact, the matter should proceed to summary judgment. I analyze such arguments below.

### 1. Counts I-IV

As always, as a federal court sitting in diversity jurisdiction, I am bound by the choice of law rules of the state of Florida in determining how to construe the language of the SPAs. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Florida law provides that the scope, effect, and meaning of the terms of the SPAs—including whether the merger, nonreliance, and claim release provisions bar Plaintiff's fraud-based claims—are governed by the choice-of-law provisions within the contract. *See Mazzoni Farms, Inc. v. E.I. DuPont DE Nemours & Co.*, 761 So.2d 306, 311, 313 (Fla. 2000) ("Generally, Florida enforces choice-of-law provisions unless the law of the chosen forum contravenes strong public policy. . . . While we both recognize and reaffirm Florida's policy disfavoring fraudulent conduct, . . . we hold that enforcement of the choice-of-law provision is not so obnoxious to Florida public policy as to render it unenforceable.").

In this case, the SPAs state that "[t]his Agreement shall be governed by, interpreted under, and construed and enforced in accordance with the laws of the State of Delaware." (DE 44-1 at 4 ¶ 4.2).[2] Accordingly, it is first necessary to analyze whether this choice-of-law provision shall be given its full effect. When doing so, I conclude that Delaware and New York law govern the effect of the nonreliance and waiver provisions. It is then necessary to see what those states' laws would command in the face of a party alleging that they were fraudulently induced to sign such a contract containing these provisions. I conclude that both Delaware and New York law would preclude Plaintiff from asserting that it relied on extracontractual statements regarding the financial condition of the Defendants. As a result, I determine that Plaintiff cannot allege that Defendants defrauded it into purchasing millions of dollars' worth of Devi stock when Jigar Patel omitted or misrepresented the status of Devi's unpaid tax liabilities.

### (A) Choice of Law

Plaintiff first argues that Florida law governs this entire case, including interpretation of the SPAs, despite the provisions of the SPAs stating otherwise. Plaintiff concludes that Florida

---

[2] Although Plaintiff does not attach the SPAs between it and the entity Defendants to the Complaint, I find that I can consider them under the "incorporation by reference" exception without turning the Motions to Dismiss into motions for summary judgment. A court may consider extrinsic documents that are attached to a motion to dismiss if those documents are referred to within the complaint, are essential to the plaintiff's claim, and the authenticity of the extrinsic documents is not disputed. *See Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002). All elements of this exception are satisfied when I refer to extrinsic documents throughout this Order, including both here, when I describe the content of the SPAs, and later in this Order, when I analyze the certificates of compliance that Devi submitted as part of its Credit Agreement with AFC Gamma. These documents are all essential to Plaintiff's claim because they either memorialize the fraudulent statements/omissions of Defendant, or because they memorialize the harm that resulted from the alleged fraud. Further, Plaintiff does not dispute at any point in its Response that the documents attached by Defendants to their Motions to Dismiss are essential to Plaintiff's claims. (*See generally* DE 52).

law applies because "recission [of the contract] [is] the primary relief sought by Plaintiff." (DE 52 at 11).

By way of explanation, "recission" of a contract is a remedy that is equitable in nature. *See Willis v. Fowler*, 102 Fla. 35, 45, 136 So. 358, 364 (1931). Court-ordered recission vitiates every part of a contact, rendering it unenforceable. Thus, because the choice-of-law provisions within the SPAs would be deemed nonexistent, the Parties would revert to the "status quo," whereby "Florida backdrop legal principles govern." (DE 52 at 10); *Lang v. Horne*, 156 Fla. 605, 615 (1945); *see Mac-Gray Services, Inc. v. DeGeorge*, 913 So. 2d 630, 634 (Fla. Dist. Ct. App. 2005). This is important because, when a litigant sues for rescission of a contract under Florida law, the well-established principle is that "a party cannot contract against liability for his own fraud" unless "the parties agree that the contract may not be cancelled or rescinded for such cause." *Oceanic Villas, Inc. v. Godson,* 148 Fla. 454, 458–59 (1941). According to Plaintiff, by seeking rescission, it has "repudiate[ed] the transaction," including all provisions of the SPAs, in their entirety.[3] *Mazzoni Farms, Inc.*, 761 So.2d 306, 313 (Fla. 2000).

I find this argument at best misguided and at worse a complete misrepresentation of Plaintiff's pleadings. The word "recission" appears nowhere within the first 106 paragraphs of the Complaint. (*See generally* DE 1). The only place the word "recission" appears in the entire Complaint is at the end, in the "Prayer for Relief." (*See* DE 1 at 23) ("Wherefore, Plaintiff 2 3

---

[3] Plaintiff also responds in opposition to Defendants' Motions to Dismiss by arguing that even under Delaware law, a party has the "right to recission of the contract[, which] is not barred by a boiler plate provision . . . that would permit one who makes a material misrepresentation to retain the benefit resulting from that misrepresentation at the expense of an innocent party." (DE 52 at 12) (quoting *Norton v. Poplos*, 443 A.2d 1, 7 (Del. 1982)). Because I conclude that Plaintiff's Complaint does not seek recission of the contract but rather damages, I need not reach the issue of whether Delaware law would allow Plaintiff to rescind the SPAs in light of the underlying factual allegations and the plain language of the contracts.

Suited demands judgment against all Defendants for compensatory damages, recission of the stock purchases, punitive damages, attorneys' fees, costs, prejudgment interest, post-judgment interest, and for such further relief as this Court deems just and proper."). Identifying a category of possible relief as an afterthought in the conclusion, despite not mentioning it under any Count in the Complaint, cannot be plausibly read to state a bona fide claim for recission.

Moreover, the clear remedy that Plaintiff seeks—damages—precludes any argument that it is requesting recission of the SPAs. Under Florida law, a party seeking equitable recission is, in effect, cancelling a contract. To do so, the party must demonstrate that it "has no adequate remedy at law." *Crown Ice Mach. Leasing Co. v. Sam Senter Farms, Inc.*, 174 So. 2d 614, 617 (Fla. Dist. Ct. App. 1965). Plaintiff has certainly alleged an adequate remedy at law; in fact, after all five counts in the Complaint, Plaintiff asserts that it has "suffered economic damages in an amount to be established at trial." (DE 1 ¶ 62) (*See also* DE 1 ¶¶ 76, 87, 07, 106). Thus, by pursuing damages as a remedy, Plaintiff has in fact "ratifie[d] the contract," including the choice-of-law provisions. *Mazzoni Farms, Inc.*, 761 So.2d at 617. Therefore, I decline to find that Florida "backdrop principles" apply by virtue of the remedy Plaintiff seeks. *See Deemer v. Hallett Pontiac, Inc.*, 288 So. 2d 526, 528 (Fla. Dist. Ct. App. 1974) (recission and damages as remedies are mutually exclusive). Instead, if the Parties contracted for another state's laws to govern the interpretation of the SPAs, then the Parties' intent will control.

Each SPA indicates that the agreements "shall be governed by, interpreted under, and construed and enforced in accordance with the laws" of either the State of Delaware, or the State of New York. The SPA that Plaintiff entered with Defendant the Patel Trust, whereby it purchased 15,000,000 shares of Devi stock, and the SPA between Plaintiff and Weldon Development, LLC, in which Plaintiff purchases 6,000,000 shares of Devi stock, call for application of Delaware law.

(DE 44-1 § 4.2); (DE 46 at 212 § 4.2). Plaintiff's agreement with Six Groove, LLC, from whom Plaintiff purchased 2,666,667 shares of Devi stock, calls for an application of New York state law in its interpretation and construction. (*Id.* at 220 ¶ 4.2). And the SPA between Plaintiff and Marvele, LLC, in which Plaintiff purchased 2,500,000 shares of Devi stock, likewise states that it shall be "governed by, interpreted under, and construed and enforced in accordance with the laws of the State of New York." (*Id.* at 228 ¶ 4.2).

These are narrow provisions requiring a court to interpret the provisions of the SPAs under the laws of Delaware and New York. However, ultimately, my inquiry would be whether Plaintiff has established a viable claim of fraud under Florida substantive law. *See Green Leaf Nursery v. E.I. DuPont De Nemours & Co.,* 341 F.3d 1292, 1301 (11th Cir. 2003) (holding that when a Delaware choice-of-law provision in a contract is narrow enough to just cover the interpretation of contractual provisions, Florida substantive law applies to the elements of the tort so long as Florida has the most significant relationship to the alleged wrongdoing). I turn to that next.

*(B) Plain language of the SPAs.*

Three sections of the SPAs are critical to Defendants' Motions to Dismiss. First, they point to Article II of the SPAs, which bears the title "Representations and Warranties of Seller. (DE 46 at 206). Under that title, Section 2.1 states: "<u>Title to Shares. Seller is the record and beneficial owner of the Shares.</u>" (*Id.* § 2.1). Section 2.2 goes on: "Authority. Seller has full requisite power and authority to execute and deliver this Agreement and to perform Seller's obligations and consummate the transactions contemplated hereunder. The seller owns and is transferring the Shares free and clear of any liens, security interests, encumbrances, and claims." (*Id.* § 2.2). Section 2.3 of the Patel SPA is titled "<u>No Other Representations or Warranties.</u>" (*Id.* § 2.3). It states: "Except for the representations and warranties made by [Entity Defendants] in Sections 2.1

18

and 2.2, [Entity Defendant] *does not make any representations or warranties to Purchaser with respect to the Company or otherwise."* (*Id.* § 2.3) (emphasis added).

Article IV of the SPA is titled "<u>General Provisions.</u>" In addition to identifying that the laws of Delaware and New York, depending on the SPA, govern the interpretation and construction of the contracts, it also includes a Section 4.3. This section is a general merger provision, and it states:

> This Agreement contains all of the agreements between the parties with respect to the matters contained herein and supersedes all prior written or oral and all contemporaneous oral agreements or understandings between the parties pertaining to any such matters. No provision of this Agreement may be amended or added to except by an agreement signed by the parties to this Agreement . . . .

(*Id.* § 4.3).

Finally, Article III is titled "<u>Representations and Warranties of the Purchaser.</u>" Importantly, Section 3.1 within that Article states:

> Purchaser is an "accredited investor" as defined in Rule 501 promulgated by the Securities Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act").

(*Id.* § 3.1). It goes on:

> Each party hereto acknowledges that it is a sophisticated investor engaged in the business of assessing and assuming investment risks with respect to securities, including securities such as the Shares, and further acknowledges that each party is entering into this Agreement in reliance on this acknowledgment and with the understanding, acknowledgment and agreement that each party is privy to material non-public information regarding [Devi] (collectively, "Non-Public Information"), which Non-Public Information may be material to a reasonable investor, when making investment acquisition and/or disposition decisions, including the decision to enter into this Purchase Agreement, and each party's decision to enter into this Purchase Agreement is being made with full recognition and acknowledgement that each party may be privy to Non-Public Information, irrespective of whether such Non-Public Information has been provided to the other party.

(*Id.*). Plaintiff and the entity Defendants then both "*waive[] any claim, or potential claim*, it has or may have against the other party *relating to such other party's possession of Non-Public Information*." (*Id.*) (emphasis added). All four SPAs contain identical language. *See* (DE 46 at 211 §§ 3.1(b), 4.3; *id.* at 220 §§ 3.1(b), 4.3; *id.* at 227 §§ 3.1(b), 4.3).

Plaintiff argues that none of these sections are explicit provisions of nonreliance on communications made throughout the course of the transactions by Jigar Patel to Plaintiff but rather standard merger clauses. In support, Plaintiff cites to *Kronenberg v. Katz*, 872 A.2d 568, 575 (Del. Ch. 2004), to state that Delaware requires an explicit statement of nonreliance as to the applicable fraud before it will be given preclusive effect. In *Kronenberg*, the Delaware Court of Chancery concluded that a standard integration clause in an agreement between the plaintiff and defendant did not preclude the plaintiff from claiming it relied on extracontractual statements from the defendant regarding specific provisions in the contract. *Id.* at 575. The Court stated that because "the integration clause in the LLC Agreement . . . cannot be unambiguously read as an anti-reliance clause, which would constitute an affirmative contractual agreement that the parties to the underlying contract were not relying on any extra-contractual statements of fact in deciding to contract," the integration clause alone did not preclude the plaintiff's fraud claims. *Id.*

But Plaintiff's argument is specious. Look at the language of the generic integration clause in *Kronenberg*:

> *GP 18.1 Entire Agreement*. This Agreement, which includes the Exhibits and shall include any Joinders upon execution thereof, constitutes the entire agreement and understanding of the parties hereto with respect to the subject matter hereof and supersedes all prior or contemporaneous agreements, understandings, inducements, or conditions, oral or written, express or implied.

*Id.* at 587. This was the provision that the Delaware Court of Chancery held was not an "unambiguous contractual provision in which the plaintiffs forthrightly affirm that they [were] not

relying upon any representation or statement of fact not contained within the LLC Agreement." *Id.* at 591.

What we have here are provisions completely different from run-of-the-mill "murky integration clauses, or standard integration clauses without explicit anti-reliance representations." *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1059 (Del. Ch. 2006). Instead, all SPAs state that the sellers have not made "any representations or warranties to [Plaintiff] *with respect to the Company or otherwise.*" (§ 2.3). Further, they explicitly identify that the contracting parties agree to the terms of the transaction "irrespective of whether . . . Non-Public Information has been provided to the other party." (§ 3.7). *Even further*, the Parties then clearly waive *all claims* related to possession of non-public information. (*Id.*) (emphasis added).

Had the Defendants merely pointed to the integration clause in the SPAs to argue for dismissal with the Motions, the Plaintiff might have a point. The integration clause is somewhat generic, stating that the SPAs contain "all of the agreements between the parties with respect to the matters contained herein and supersedes all prior written or oral and all contemporaneous oral agreements or understandings between the parties pertaining to any such matters." (§ 4.3). But Defendants do not just rely on this integration clause. Instead, Defendants point to multiple sections within each of the SPAs that provide the Defendants are not making any representations about Devi Holdings, Inc., which logically includes any representations about the financial health of Devi, and that the Parties are aware, and ultimately do not care, about the status of nonpublic information. Clearly, in this situation, the SPAs "contain[] language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract." *Kronenberg*, 872 A.2d at 593.

Even in *Kronenberg*, the court cited the Delaware Supreme Court's decision of *Norton v. Poplos*, 443 A.2d 1 (Del. 1982), for the proposition that when considering the "relatively unsophisticated nature of the parties involved in the case . . . [who] did not bargain over the specific disclaimer language," the court need not give effect to a "boiler plate" provision about extracontractual representations. But the *Kronenberg* court still found that Delaware law "giv[es] effect to an anti-reliance clause in cases involving experienced businesspersons or entities negotiating complex commercial agreements." *Kronenberg*, 872 A.2d at 590. In *Kronenberg*, "there [was] no evidence that any of the parties to the LLC Agreement viewed the integration clause as a bar to fraud claims" specifically because "[t]he provision was not heavily negotiated." *Id.* at 592–593.

Here, we have the opposite of the *Norton* situation. Forget the fact that the SPAs state—in plain language—that the Parties are sophisticated, accredited investors "as defined in Rule 501 promulgated by the Securities Exchange Commission under the Securities Act of 1933." (*See e.g.*, DE 44-1 at 2 § 3.1(b)). But even accepting the factual allegations within the four corners of Plaintiff's Complaint as true, which I am required to do at this stage, those allegations would mandate a finding that Plaintiff is a sophisticated party. The Complaint states that Mr. Tannenbaum is a "macro investor who has underwritten almost $10 billion of loans and taken four entities public." (DE 1 ¶ 16).[4]

---

[4] Plaintiff argues that even if the Court interprets the SPAs as containing "anti-reliance" provisions, the matter should proceed to summary judgment because there is a question of fact regarding whether Plaintiff is a sophisticated investor. *See* (DE 52 at 18). To begin, courts applying New York and Delaware law frequently consider the sophistication of litigants when evaluating a motion to dismiss in fraud cases. *See e.g.*, *Harso Corp. v. Seguri*, 91 F.3d 337, 343 (2d Cir. 1996); *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 555 (Del. Ch. 2001). Moreover, Plaintiff acknowledges that it is a sophisticated investor within each SPA that it entered. Plaintiff cannot agree to be bound by its statement that it was a sophisticated investor and then argue that whether it is truly sophisticated is for a jury to decide. Plaintiff should be effectively estopped from

The same result would hold under New York law with respect to the effect of the SPAs' language. In New York, "a merger clause is ineffective . . . to preclude parol evidence that a party was induced to enter the contract by means of fraud." *Manufacturers Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993) (citing New York case law). But so long as there is a "specific disclaimer" that a plaintiff is "not relying on any representations as to the very matter as to which is now claims it was defrauded," then the disclaimer "destroys the allegations in plaintiff's complaint that the agreement was executed in reliance upon . . . contrary oral representations." *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 321 (1959). At bottom, Plaintiff's claims are about the fact that it was duped regarding the status of Devi's unpaid tax liabilities. This implicates the heart of the anti-reliance and warranties sections of the contracts.

Finally, Plaintiff argues that these are not true anti-reliance provisions because "the SPAs do not disclaim reliance on *any* representations of the Sellers, much less the 'specified representations' regarding tax liabilities that would be necessary in order for Defendants' arguments to have any merit." (DE 52 at 21). To be true anti-reliance provisions, Plaintiff argues, they would need to say something to the effect of: "Plaintiff is not relying on any extra-contractual statements of fact in deciding to contract." (*Id.* at 13). Plaintiff continues: "a generic reference to 'non-public information' is not 'specific' . . . . There are simply no 'specific extra-contractual representations spelled out in the SPA as to which Plaintiff unequivocally disclaimed reliance." (*Id.*). But the contracts are about as definite as they can get: they state that Plaintiff knew Defendants might possess material, nonpublic information, that Plaintiff was entering the contract despite such unknown, nonpublic information, and that the Parties were waiving any claims with

---

arguing that the sophistication point is a matter for summary judgment because Plaintiff described itself as a sophisticated party in the Complaint and contractually defined itself as a "sophisticated party" within all of the SPAs.

respect to that nonpublic, material information. It would be an exercise in mental gymnastics to buy Plaintiff's argument that these are statements regarding the Parties' mere possession and omission of nonpublic information and that these do not add up to anti-reliance provisions regarding the possession and omission of nonpublic information.

*(C) Effect of the Anti-reliance Provisions under State law.*

A scan of New York law and Delaware law reveals consistency regarding the effect of such anti-reliance provisions: Plaintiff cannot establish that it plausibly relied on material omissions or misrepresentations outside the four corners of the SPAs regarding material, nonpublic information, such as the representations that Jigar Patel made pursuant to the Credit Agreement with AFC Gamma, when the SPAs all explicitly disclaim any reliance by Plaintiff on such outside representations. *See H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 142 n.18 (Del. Ch. 2003) ("The Court of Chancery has consistently held that sophisticated parties to negotiated commercial contracts may not reasonably rely on information they contractually agreed did not form a part of the basis for their decision to contract."); *Manufacturers Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993) ("When . . . [a] contract states that a contracting party disclaims the existence of or reliance upon specified representations, that party will not be allowed to claim that he was defrauded into entering the contract in reliance on those representations.") (*citing Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 94, 485 N.E.2d 974, 976 (1985)). The New York Court of Appeals has gone so far as to hold that a person who makes "a representation in the contract that it was not relying on specific representations not embodied in the contract," who then uses those misrepresentations to support an allegation of fraud, is themselves "guilty of deliberately misrepresenting its true intention." *Danann Realty*, 5 N.Y.2d at 323.

But Plaintiff disagrees and argues that the provision of the contracts waiving claims only possibly bars claims relating to the "possession or non-disclosure [of nonpublic information]." (DE 52 at 15). By its own terms, according to Plaintiff, the provision does not waive claims regarding "affirmative 'representations' regarding specified information." Therefore, Plaintiff states that the SPAs' provisions fail to cover the facts as it has pleaded. *See* (DE 52 at 19–21).

I understand the appeal of Plaintiff's arguments and acknowledge that if this were a case where the Defendants affirmatively misrepresented the status of Devi's unpaid tax liabilities—for example, by informing Mr. Tannenbaum, "Yes, all the tax liabilities have been paid in full,"—the question of whether Plaintiff could establish that it reasonably relied on affirmative representations about that nonpublic information might be a closer call. That is because the SPAs waive claims related to the *possession* and *nondisclosure* of nonpublic information.

Ultimately, however, I find that this case is not one of affirmative misrepresentation but rather omission, and it is therefore within the umbrella of the SPAs' waiver. But even further, were I to accept Plaintiff's characterization of its pleaded facts that it makes in Response to the Motions to Dismiss (which is that Defendants, conspiring with Jigar Patel affirmatively lied about Devi's unpaid tax liabilities), as opposed to relying on the pleading itself, I would still find that Delaware and New York law preclude relief.

First, this case, at least ostensibly, appears to be one of fraudulent *omission* rather than fraudulent misrepresentation. Plaintiff's Complaint consistently states as much: the bulk of Plaintiff's fraud allegations appear in paragraphs 24 through 35 of the Complaints. *See* (DE 1 ¶¶ 24–26). In these paragraphs, Plaintiff claims that Mr. Patel delivered a PowerPoint to Mr. Tannenbaum providing a financial summary for Devi. (*Id.* ¶ 24). In that PowerPoint, Jigar Patel "failed to disclose approximately $8 million in tax liabilities." (*Id.*). In January 2021, Jigar Patel—

when asked if there were any financial problems—responded that "Devi's financials were healthy, and that the shares had a value of approximately $1.50 a share. Again, on that call, Jigar Patel failed to disclose his . . . knowledge of Devi's unpaid tax liabilities." (*Id.* ¶ 26). On March 23, 2021, Mr. Tannenbaum asked Jigar Patel in a text message if there was "anything in accounting that's an issue?" (*Id.* ¶ 32). Jigar Patel responded: "I don't think so." (*Id.*). Within the Complaint, Plaintiff also points to two compliance certificates that Jigar Patel delivered to Mr. Tannenbaum pursuant to Devi's Credit Agreement with AFC Gamma in December of 2020 and March of 2021. Plaintiff argues that these certificates "falsely certify[] that all of Devi's outstanding taxes had been paid, when in reality, Devi owed approximately $8 million." (*Id.* ¶ 25). But a review of those certificates, attached by Defendants as part of their Motion to Dismiss and referenced by Plaintiff as an essential part of the fraud claim in its Complaint, do not reveal any statements affirmatively made about the unpaid tax liability. (*See* DE 46 at pp. 252–257). Thus, all of Plaintiff's claims fundamentally rely on an allegation that, by omitting Devi's tax liabilities, Defendants created a fraudulent impression of Devi's financial situation.

But even further, New Jersey and New York cases demonstrate that the distinction between a fraudulent representation versus omission is ultimately semantic; regardless of how Plaintiff characterizes the allegations in the Complaint, and regardless of the precise language of the contract, relief in this case would be precluded as a matter of law. For example, in *Prairie Capital III, L.P. v. Double E. Holding Corp.*, 132 A.3d 25, 28 (Del. Ch. 2015), the plaintiff alleged that the defendants fraudulently induced it to enter a stock purchase agreement by providing fabricated documents regarding the defendants' projected revenue. The documents provided to the plaintiff by the defendants indicated that the defendants were on track to meet their projected, end-of-month sales figures. *Id.* at 46. The Delaware Court of Chancery noted that the fraud was elaborate:

defendants "instructed several Company employees to identify pending orders . . . [and] generate[]
false shipment entries in the Company's recordkeeping system to make it appear that those
products actually shipped." *Id.* at 47. The company then "backdated these records to avoid arousing
suspicion." *Id.* They further "produced false invoices and booked revenue in the Company's
accounts receivable." *Id.* Such conduct made it appear that the Company was financially stable.

Despite plaintiff in *Prairie Capital* making it clear that the company's sales "were critical
to [plaintiff's] willingness to sign the SPA and close," *id.* at 45, the Court of Chancery still found
that the plaintiff could not establish that it reasonably relied on fraudulent sales documents outside
the four corners of the purchase agreement when deciding to execute the transaction. It held that
in light of the plain language of the stock purchase agreement:

> In making its determination to proceed with the Transaction, the
> Buyer has relied on (a) the results of its own independent
> investigation and (b) the representations and warranties of the
> Double E Parties expressly and specifically set forth in this
> Agreement, including the Schedules. SUCH REPRESENTATIONS
> AND WARRANTIES . . . CONSTITUTE THE SOLE AND
> EXCLUSIVE REPRESENTATION AND WARRANTIES OF
> THE . . . PARTIES . . . IN CONNECTION WITH THE
> TRANSANCTION, AND THE BUYER . . . AGREES THAT ALL
> OTHER REPRESENTATIONS . . . ARE SPECIFICALLY
> DISCLAIMED.

(*Id.* at 50).

In a similar vein to Plaintiff here, the plaintiff in *Prairie Capital* tried to slice and dice the
language of the contract; the plaintiff argued that the language waived claims related to
"representations" by the defendants, it did not cover fraudulent *omissions* and *concealments*. But
the court held it did not matter: "'Every misrepresentation, to some extent, involves an omission
of the truth . . . .' Consequently, any misrepresentation can be re-framed for pleading purposes as
an omission." *Id.* at 52 (quoting *Universal Am. Corp. v. P'rs Healthcare Sols. Hldgs., L.P.*, 61

F.Supp. 3d 391, 400 (D. Del. 2014)). Because the plaintiff in *Prairie Capital* contemplated a "universe of information that [was] in play for purposes of a [potential] fraud claim," and because the parties identified the "representations of fact that formed the reality upon which the parties premised their decision to bargain," it did not matter whether the contractual language explicitly waived reliance on extra-contractual representations or extra-contractual omissions. *See Prairie Capital*, 132 A.3d at 52 ("The critical distinction is not between misrepresentations and omissions, but between information identified in the written agreement and information outside of it.") (citation omitted).

Ultimately, *Prairie Capital* demonstrates that parties can contract around fraud claims involving affirmative misrepresentations, including falsified documents about the financial status of a company. It also stands for the proposition that, regardless of how Plaintiff minces the SPAs' waiver language, the inquiry that the Court must make is a practical one. Thus, if a contract identifies the "representations on which a party exclusively relied," or, in this case, did *not* rely, then a party "cannot point to extra-contractual information and escape the contractual limitation." *Id.* at 52.

New York law is no different on this point. In *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 192 (2d Cir. 2003), the Second Circuit, applying New York law, affirmed in part the dismissal of a complaint alleging securities fraud. The defendant in that case was a holding company that had begun soliciting investors for a private placement of its securities. *Id.* at 192. The plaintiff alleged in its complaint that the defendant, in meetings with the plaintiff, represented it had "invested approximately $17 million in seven e-commerce companies, and that the largest of those investments was a $14 million purchase of a 12 percent equity interest in [a third-party company]." *Id.* The defendants provided written documents that "repeated their

oral representations with respect to the size of the [third party] investment." *Id.* at 193. As a result, the plaintiff purchased $2 million in securities from the defendant. *See id.* Within the stock purchase agreements, the defendant "made extensive warranties and representations regarding its capital structure, indebtedness, involvement in litigation, ownership and leases of real and personal property, and other matters connected with its business" *Id.* Additionally, the stock purchase agreement contained a "standard merger clause, stating that the agreement . . . 'contain[ed] the entire understanding and agreement among the parties . . . .'" *Id.* (alteration in original). The Second Circuit noted that prior to the plaintiff's purchase of the stock, the third-party investment "had not been publicly disclosed in [defendant's] regulatory filings." *Id.* But two months after the plaintiff and the defendant executed their transaction, the defendant filed its 10-K form the with SEC, which indicated that the defendant's "investment [in the third-party company] amounted to $4 million, not the $14 million that it had represented to plaintiff." *Id.* Although the contract in *Emergent Capital* did not "specifically state that [the defendant] makes no representations other than those contained in the sections of the purchase agreement concerning [the defendant's] representations, warranties, and covenants," the district court still found, and the Second Circuit upheld, that the merger and warranties clauses were sufficiently specific to preclude recovery by plaintiff as to any allegedly fraudulent misrepresentations regarding those specific warranties. *See Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 195 F. Supp. 2d 551, 563 (S.D.N.Y. 2002)*, aff'd in part, vacated in part,* 343 F.3d 189 (2d Cir. 2003).

Like the court *in Prairie Capital*, I find that whether Plaintiff styles its claim as one of fraudulent omission or misrepresentation ultimately does not matter. Further, like the court in *Emergent Capital*, I find that the specific subset of representations made in each of the SPAs, especially Sections 2.3 and 3.1, demonstrate that Plaintiff could not have depended on nonpublic

information outside the four corners of the contracts. Although those sections might not precisely acknowledge the exact facts Plaintiff *is* relying on, they establish the information that Plaintiff is *not* relying on. And that is enough. The SPAs are broad, yet specific enough to waive claims related to fraudulently withholding or misrepresenting unpaid tax liabilities, which is quintessential nonpublic information as defined by the agreements. That Plaintiff is now "disappointed with the written agreement," cannot result in it "escap[ing] through a wormhole into an alternative universe of extra-contractual omissions." *Prairie Capital*, 132 A.3d at 52.

"Sophisticated parties can and should make their own judgments about the risk they should bear." *New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 565–66 (Del. Ch. 2023). Plaintiff, as a sophisticated party who has affirmed the contents of the SPAs by suing for damages, is bound by its own representations within those contracts that it did not rely on any representations or agreements regarding nonpublic information outside the four corners of the SPAs. If Plaintiff were relying on Jigar Patel's representations regarding the tax liabilities of Devi, either through the compliance certificates that Devi submitted to Mr. Tannenbaum pursuant to the Credit Agreement with AFC Gamma, or the texts that Jigar Patel sent Mr. Tannenbaum stating he "didn't think" there was anything wrong with Devi's finances, then Plaintiff could have included that in the contract.

In sum, both New York and Delaware law preclude Plaintiff from claiming it relied on any alleged misrepresentations or omissions made by Defendants regarding Devi's unpaid tax liabilities. Accordingly, all fraud claims asserted by Plaintiff that require "reliance" as an affirmative element under Florida law must be dismissed.

### 2.  Count V

Finally, because I am dismissing the prior four counts for Plaintiff's failure to plausibly plead reasonable reliance on any of Defendants' claims, I must dismiss Count V as well. Florida

law does not recognize an independent cause of action for civil conspiracy. *Raimi v. Furlong,* 702 So. 2d 1273, 1284 (Fla. Dist. Ct. App. 1997) ("[A]n actionable conspiracy requires an actionable underlying tort or wrong.") (quoting *Florida Fern Growers Assoc.. v. Concerned Citizens of Putnam Cnty.*, 616 So.2d 562, 565 (Fla. 5th DCA 1993)). In other words, a plausible claim for civil conspiracy rises or falls with the plausibility of the other claims in a complaint. As Plaintiff's fraud claims must all be dismissed under Federal Rule of Civil Procedure 12(b)(6), so too must its civil conspiracy claim.

## IV.   CONCLUSION

Accordingly, for all the foregoing reasons, it is **ORDERED AND ADJUDGED:**

1) Defendants' Motions to Dismiss (DE 44; DE 45) are **GRANTED**.

2) This case is **DISMISSED WITHOUT PREJUDICE**. Plaintiff does appear to have requested an opportunity to amend its Complaint (*See* DE 52 at 36) ("In any event, to the extent the Court finds that greater specificity is required, such a deficiency can be easily cured with an amendment. . . ."). I am doubtful that these allegations can be recast to state a viable claim given my understanding of Plaintiff's theory of the case, and given the status of the governing law, as I have explained it in this Order. Although amendment may very well be futile, Plaintiff has expressly requested to try, and, therefore, in an abundance of caution, I will provide Plaintiff with one opportunity to attempt to cure the fundamental problems I have identified here.

3)   Plaintiff shall have until **September 6, 2024,** to file an amended complaint in this

matter. If Plaintiff fails to file a Complaint by that date, I will close this case.

**SIGNED** in Chambers at West Palm Beach, Florida, this 15th day of August, 2024.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

cc:      Counsel of Record

32